**TRIPLEDGE PRODUCTS, INC. and Lifetime Automotive Products, Inc., Plaintiffs,**

**v.**

**WHITNEY RESOURCES, LTD., Defendant.**

**No. CV 90–1071 (ADS).**

United States District Court, E.D. New York.

April 18, 1990.

Baker, Mills & Glast, Dallas, Tex. (Mark J. Zimmermann, of counsel), and Anderson Kill Olick & Oshinsky, P.C., New York City (Walter G. Marple, Jr., of counsel), for plaintiffs.

Weil, Guttman & Malkin, New York City (Michael M. Malkin and Gilbert H. Weil, of counsel), for defendant.

Lord Day & Lord, Barrett Smith, New York City (Gerald A. Novack, of counsel), for non-party Valassis Inserts, Inc.

## MEMORANDUM DECISION

SPATT, District Judge.

This memorandum decision results from an evidentiary hearing on the plaintiffs' motion for a preliminary injunction to enjoin defendant's use of "trade dress" and certain terms contained in their advertisements on the grounds that they are allegedly "confusingly similar" to advertisements used by the plaintiffs and also that the defendant's advertising of the wipers at issue were false, misleading and deceptive. The plaintiffs allege that the defendant violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), as well as New York General Business Law §§ 349, 350 and 368–d, and common law. Specifically, plaintiffs have requested a preliminary injunction enjoining the defendant from:

> "(1) soliciting in any manner, sales of windshield wiper blades sold under the name TRIPLE–EDGE or any colorable variation thereof; (2) advertising the sale of windshield wiper blades using advertising or promotional materials that are similar to those materials employed by Plaintiffs in connection with the sale of TRIPLEDGE windshield wiper blades; (3) soliciting sales of windshield wiper blades designed with a five (5) rib construction; (4) causing to be mailed any advertisements for windshield wiper blades of the type described above; and (5) filling any orders for windshield wiper blades of the type described above."

Plaintiffs' Order to Show Cause for Temporary Restraining Order and Preliminary Injunction at p. 1.

The Court heard oral argument on the motion on March 30, 1990. Thereafter, an evidentiary hearing was ordered, and subsequently held on April 6, 12, 13 and 16, 1990. Oral argument was again heard on April 18, 1990, at which time non-party Valassis Inserts, Inc. appeared through counsel. On April 18, 1990, the Court rendered an Order. Pursuant to Fed.R.Civ.P. 52, the following constitute the Court's

findings of fact and conclusions of law, most of which were also read from the bench on April 16, 1990.

## FACTUAL BACKGROUND

Plaintiff Tripledge Products, Inc. manufactures the "squeegee" portion of multi- or triple-edged windshield wiper blades— *i.e.*, the rubber portion only—and sells them to the plaintiff Lifetime Automotive Products, Inc. Lifetime completes the assembly of the wipers, including the spline (*i.e.*, a plastic or metal back to the rubber portion), claws and metal superstructure or frame, to create the entire windshield wiper product sold on the market.

Lifetime is a "direct marketer" of aftermarket automotive products. One such product is the mutli- or triple-edged windshield wiper blade ("wipers") purchased from Tripledge, for which the United States Commerce Department—Patent and Trademark Office ("Patent & Trademark Office") granted a patent on October 2, 1984 for its design and shape. (Plaintiffs are hereinafter collectively referred to as "TRIPLEDGE".)

TRIPLEDGE alleges in its motion papers (supported by testimony at the hearing), that it has invested large sums of money in advertising and marketing these wipers. TRIPLEDGE advertises on television, in newspapers, magazines, catalogs, direct consumer mailings through credit card inserts and "free standing inserts" ("FSIs"), which are color supplements usually found in the Sunday edition of newspapers. As a result, TRIPLEDGE claims that its wipers have enjoyed wide acceptance and acquired a reputation for quality and have generally been a great commercial success. The plaintiffs' wipers currently sell for $19.95 a pair, with a lifetime guarantee (*i.e.*, as long as the purchaser owns the car, if the wipers are "unsatisfactory", they will be replaced).

TRIPLEDGE has unsuccessfully attempted to obtain a registered trademark of the name "Tripledge" on the principal register of the Patent & Trademark Office. Its application was most recently rejected by the Patent & Trademark Office on July 20, 1988, on the ground that the mark is merely "descriptive". TRIPLEDGE alleges, however, that as of January 3, 1990, it has held the mark exclusively and continuously for 5 years, and therefore has since applied for registration on the "supplemental register" under 15 U.S.C. § 1052(f).

WHITNEY is also in the direct marketing business. It is a direct marketer of general merchandise, such as dolls, imitation gold ropes, books, tapes, imitation "Lego" blocks, headset radios, tape recorders, closet "space saving" hangers, a pet brush and inflatable Christmas ornaments, among other items (Tr. at pp. 32–36).[1] A fundamental strategy of WHITNEY's business is to find a product that is doing well on the market, copy such product and sell it at a very competitive, undercut price (Tr. at p. 30). This type of business is frequently referred to as "knock-off" marketing. WHITNEY advertises most of its products in the form of FSIs, as described above. Most of its products, manufactured in the Far East, such as the toy mug, are obtained from one Eddie Mishan ("MISHAN"), a general merchandiser who imports from overseas.

In December of 1989, Morton Rosner ("ROSNER"), sole shareholder and operator of WHITNEY, saw a TRIPLEDGE advertisement for its triple-edged wipers (Tr. at p. 39). ROSNER immediately contacted MISHAN to see if MISHAN could "make something similar to this" and "as close to the Tripledge product as possible" (Tr. at p. 40). ROSNER sent MISHAN a copy of a TRIPLEDGE advertisement. After MISHAN was able to obtain a similar appearing wiper, ROSNER ran an FSI advertisement in newspapers in early March, 1990.

WHITNEY's first advertisement appeared in an FSI on March 4, 1990, in approximately 1 million copies of newspapers throughout 10 cities across the country. The advertisement used the phrase "TRIPLE–EDGED" in a banner headline. A photograph of the complete wiper—including the superstructure—runs diagonal-

---

**1.** "Tr. at p. ___" refers to pages of the Hearing Transcript.

ly across the ad. It also used an insert diagram showing a cross-section of the multiple-edged blade, with a brief description of the function of each blade. WHITNEY also provided a 5-year warranty. This ad offered the complete wiper including superstructure for sale. In general, the ad uses much of the same lettering, language and layout as that of the TRI-PLEDGE ad sent to MISHAN by ROSNER. As a direct result of that advertisement, WHITNEY received between 600 and 700 orders. In addition, on April 2, 1990, WHITNEY ran another similar ad using the name "multi-angled" instead of "triple-edged".[2] This ad was for the rubber portion only.

Although WHITNEY has been advertising its wipers, it is conceded by ROSNER that he had never tested or even seen one. In fact, WHITNEY was accepting orders without having *any* inventory stock whatsoever. Mr. ROSNER testified that he anticipates receiving the wipers by the end of April, 1990. The testimony in this regard is particularly illuminating:

"Q. Mr. Rosner, regardless of what you call your product, in each of your ads you make claims for certain quality, is that correct?
A. That's right.
Q. And you make claims for lifelong guarantee, is that correct?
A. No, I don't call it lifelong. I call it lifetime guarantee.
Q. Make a lifetime guarantee?
A. Yes.
Q. Mr. Rosner, as of March 4, when you put these ads in the paper, did you have product to ship?
A. No, I didn't. As of March 4?
 * * * * * *
Q. As of March 4, 1990, you had no product to ship, is that correct?
A. That is correct.
Q. As of April 6, 1990, you have no product to ship, is that correct?
A. That is correct.
 * * * * * *

Q. As of April 6, 1990, you have never tested any wiper blade which you intend to ship pursuant to any of these ads, have you?
A. That is correct.
Q. You haven't seen any testing of any wiper blade that you intended to ship under any of these ads as of today, is that correct?
A. That is correct.
 * * * * * *

THE COURT: You put an ad in March 4. You didn't have a product?
THE WITNESS: I didn't have product shipped.
THE COURT: Yes.
THE WITNESS: That's right.
THE COURT: Right. As of today, you don't have the product?
THE WITNESS: Right. I have eight weeks to ship.
 * * * * * *

Q. Mr. Rosner, notwithstanding the fact that you have never tested this product, nor received the product, you put certain warranties and representations on each of your ads, Exhibit 7, nine, ten and eleven, is that correct?
A. Yes.
Q. These are the representations that the product is of a high quaility [sic], is that correct?
A. Yes.
Q. And that it will do certain things, is that correct?
A. Yes.
Q. And you represented that the product is easy to install, is that correct?
A. Yes.
Q. On each of those ads, true?
A. Yes.
Q. Have you ever installed the product?
A. No.
 * * * * * *

Q. Answer my question, Mr. Rosner. On March 4, did you know the name of

**2.** It is not clear whether the 600 to 700 orders received resulted only from the March 4th ad, or whether that also includes orders from the April 2nd ad.

the material that composed the wiper blade, yes or no?

A. I did not know the trademark name.

Q. You didn't know the name, yes or no?

A. I didn't know the name.

Q. All right. Now, Mr. Rosner, you don't know as you sit here today whether three edges of this blade on your blade will touch the windshield when it is in use, do you?

A. Yes, I do.

Q. You don't know whether three edges will touch the windshield simultaneously?

A. I don't know. I didn't make a statement that they were going to touch simultaneously. I say in the ad that—

Q. Just answer my question.

A. What was the question now?

Q. You don't know today if three edges will touch the windshield simultaneously?

A. I do not know that, that's correct.

Q. All right. Now, prior to putting these ads in the paper about the windshield wipers, you never made a product with a lifetime guarantee, correct?

A. That's correct."

(Tr. at pp. 51–57.)

WHITNEY is scheduled to run additional and similar FSIs on April 29, 1990 and May 6, 1990 advertising the sale of the rubber portion only. On about March 10, 1990, after the first ad ran however, MISHAN told ROSNER that he should not use the phrase "TRIPLE–EDGED" in its ads:

"Q. Mr. Rosner, prior to you putting the ad in your first Triple-edged, with a "D" ad, you had conversations with Eddie about the use of that term that you used, Triple-edged, correct?

A. Yes.

\* \* \* \* \* \*

THE COURT: No. Listen to me. In any conversations with Mr. Mishan, did he say to you, the question is being put to you, don't use the word Triple-edged?

THE WITNESS: He suggested maybe I should find another description for it. After the ad ran, not before. There was no talk of it at all.

Q. Okay. After the—after the ad ran, on about March 10, he said maybe you should change the name because some big monster will come and sue you, right?

A. That is correct."

(Tr. at pp. 42–43.)

After waiting 11 days, on March 21, 1990, ROSNER decided to adhere to MISHAN's advice. WHITNEY thereafter attempted to stop the publication and was able to change the banner headline to "MULTI–ANGLED" rather than "TRIPLE–EDGED" on approximately 65 million copies of the April 29 advertisement. Other than the name change, the format of the ads remains the same. However, in these ads, similar to the April 2, 1990 *Chicago Sun Times* ad, WHITNEY was not going to sell the entire wiper with the superstructure, but only the rubber portion with the "spline". In addition, rather than the 5–year warranty, a lifetime one was offered. The publisher of the FSI allegedly was not able to "stop the presses" as to approximately 25 million April 29 ads, which still bear the title "TRIPLE–EDGED".

Besides alleging that WHITNEY's product is inferior,[3] TRIPLEDGE claims that WHITNEY's ads are deceptive, false and contain misrepresentations insofar as the *Chicago Sun Times* ad and all future ads offer to sell the rubber portions only, but this is not clear in the ads to the consuming public. Plaintiff also claims that WHITNEY does not have the capability to honor its lifetime warranty, and that WHITNEY claims in the ads that the blades "fit virtually every U.S. and imported car", when in

---

**3.** Plaintiffs claim that TRIPLEDGE's squeegees are made from a process known as "extrusion", whereas the defendant's are "molded". "Extrusion" is the formation by forcing or pressing the material through a die (*see* Webster's New Universal Unabridged Dictionary at p. 652), much like a "Play–Do" machine, according to Charles Fichtner, Manager of Marketing of TRIPLEDGE, who testified that this is a better process for manufacturing wipers than molding.

Also, there was no evidence as to the precise composition of the defendant's wipers.

fact they do not. Finally, plaintiff argues that TRIPLEDGE's good will and established reputation will be irreparably harmed by allowing WHITNEY to place inferior, confusingly similar wipers into the stream of commerce.

It is the publication of the April 29 and May 6 advertisements that TRIPLEDGE now seeks to enjoin. TRIPLEDGE alleges that the format and language contained in its advertisements are protected under the Lanham Act, and that WHITNEY's ads constitute unfair competition, unfair business practice, unlawful dilution of TRIPLEDGE's trademark, and false advertising under both the Lanham Act and New York law. TRIPLEDGE also seeks to enjoin defendant from filling orders resulting from WHITNEY's earlier advertisements.

On the last day of the hearing, April 16, 1990, plaintiffs' counsel stated that the defendant may have published another advertisement for its wipers in a newspaper called the *Star*. Since the plaintiffs did not pursue this matter by way of proof, the Court declines to address the *Star* ad at this time.

## APPLICABLE LAW

a) *Standard for a Preliminary Injunction:*

In order to obtain a preliminary injunction in the Second Circuit, the movant must establish, by a "clear showing", certain elements:

> "A party seeking a preliminary injunction in this circuit must establish both possible irreparable injury and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor."

*LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 74 (2d Cir.1985); *see also Stormy Clime, Ltd. v. Progroup, Inc.*, 809 F.2d 971, 973 (2d Cir.1987).

4. Prior to the amendment, under which the bulk of the case law was decided, section 43(a) provided in relevant part:

■ Generally, where money damages provide an adequate remedy, a preliminary injunction will not issue (*see Jackson Dairy Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 [2d Cir.1979] [*per curiam*]).

b) *"Unfair Competition" and "Trademark Infringement":*

It appears from TRIPLEDGE's motion papers that it is seeking only to restrain the April 29 and May 6 advertisements for WHITNEY's triple-edged and multi-angled wiper blades; to enjoin WHITNEY from using confusingly similar terms in its advertisements; and to enjoin WHITNEY from filling any orders that it has thus far received as a result of its previous advertisements. In any event, in support of its application for a preliminary injunction, TRIPLEDGE relies on section 43(a) of the Lanham Act, (discussed below first), as well as New York state law (discussed second).

i. Lanham Act Claims.

■ The doctrine of "unfair competition" is distinguished from "trademark infringement", insofar as the former does not involve an exclusive right to use a particular name, symbol or device. Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides a statutory remedy for trademark infringement and unfair competition to a party injured by a competitor's false designation of origin of its product, even if the aggrieved party does not have a registered trademark (*LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 75 [2d Cir. 1985]). Section 43(a) provides an additional remedy for the false or misleading or deceptive advertisement of facts. In sum, section 43(a) provides a civil remedy to one damaged by reason of either "false or misleading advertising" or "trademark" or "trade dress" infringement.

Section 43(a) of the Lanham Act, which was recently amended [4] effective November 16, 1989, provides:

> "Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false de-

"(a) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, *or any ... false or misleading description of fact, or false or misleading representation of fact,* which—

\* \* \* \* \* \*

(2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities ... of his ... goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." 15 U.S.C. § 1125(a) (emphasis supplied).

■ In order to establish standing under section 43(a) of the Lanham Act, "a commercial party must show it has a 'reasonable interest to be protected' against the allegedly false advertising claims" (*Princeton Graphics Operating, L.P. v. NEC Home Elecs. (U.S.A.), Inc.*, 732 F.Supp. 1258 [S.D.N.Y.1990], quoting *PPX Enters., Inc. v. Audiofidelity, Inc.*, 746 F.2d 120, 124 [2d Cir.1984]). Here, the Court finds that since both parties are direct competitors in the multi-edged windshield wiper business, plaintiff has standing to bring this action.

Although TRIPLEDGE sued for trademark as well as trade dress infringement, it appears that for purposes of the application for a preliminary injunction, plaintiff's claims are actually based upon trade dress infringement, rather than trademark infringement. The legal significance of the difference, however, is apparently limited (*Score, Inc. v. Cap Cities/ABC, Inc.*, 724 F.Supp. 194, 197 [S.D.N.Y.1989]). For the purpose of obtaining a preliminary injunction to enjoin WHITNEY's advertisements, TRIPLEDGE raises the claims of "false or misleading advertising" and "trade dress infringement" under the Lanham Act, in which both theories are recognized under section 43(a). They are, however, subject to distinct analyses, and therefore discussed separately below.

(1) Trade Dress Infringement

■ The "trade dress" of a product (*i.e.,* "total image of a product"), may be eligible for protection under section 43(a), if it has acquired a "secondary meaning" in the marketplace. Trade dress infringement actions usually involve the packaging or labeling of a product, but may also encompass the design of a product itself (*LeSportsac, supra,* 754 F.2d at 75).

[6] In order to recover for a trade dress infringement under section 43(a), TRIPLEDGE must establish: (1) that its trade dress has acquired secondary meaning in the marketplace as to the source of the product; *and,* (2) that a likelihood of confusion exists between the source of the product—or, more specifically, between the trade dress of TRIPLEDGE and WHITNEY (*Goya Foods, Inc. v. Condal Distribs., Inc.*, 732 F.Supp. 453 [S.D.N.Y.1990] citing *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 75 [2d Cir.1985]). This two-part analysis determines whether TRIPLEDGE: (1) has a protective interest; and, (2) whether that interest is being infringed (*Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1221 [2d Cir.1987]).

Proving secondary meaning " 'entails vigorous evidentiary requirements', in accordance with the criteria established by the Court of Appeals for the Second Circuit" (*Playskool, Inc. v. Product Dev. Group, Inc.*, 699 F.Supp. 1056, 1061 [E.D. N.Y.1988]), which the party seeking to prove has a "heavy burden" (*20th Century Wear, Inc. v. Sanmark–Stardust Inc.*, 815 F.2d 8, 10 [2d Cir.1987]). According to *20th Century,* it has been suggested that plaintiff should attempt to offer evidence of consumer studies and successful advertising. Additionally, a finding that the de-

scription or representation, including words or symbols tending to falsify to describe or represent the same ... shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin ...

or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation." 15 U.S.C. § 1125(a) (1982).

fendant intentionally copied plaintiff's mark "could also be persuasive, if not conclusive, evidence of consumer recognition and good will" (*id.*).

■ Accordingly, in order to establish that trade dress has acquired a secondary meaning, the plaintiff must show that the purchasing public associates goods designated by a mark with a *particular source* (*id.*). As Judge Metzner stated, "[t]he crux of the secondary meaning doctrine is that the mark comes to identify not only the goods but the source of the goods" (*Ralston Purina Co. v. Thomas J. Lipton, Inc.*, 341 F.Supp. 129, 133 [S.D.N.Y.1972]). Factors to be considered in determining whether the plaintiff has established a secondary meaning, include: "(1) sales success; (2) the senior user's advertising expenditures; (3) unsolicited media coverage of the product; (4) consumer surveys; (5) intentional copying of the product; and (6) length and exclusivity of the product in the market" (*PAF S.r.l. v. Lisa Lighting Co.*, 712 F.Supp. 394, 403 [S.D.N.Y.1989]).

Once plaintiff has established that the trade dress—here, the advertisements—has acquired a secondary meaning in the marketplace, the burden shifts to the defendant to show that the trade dress sought to be protected is "functional", and therefore is not covered under section 43(a) of the Lanham Act (*see LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 76 [2d Cir.1985]). A "functional" feature is one that "is essential to the use or purpose of an article or ... affects the cost or quality of the article" (*id.; see also Stormy Clime Ltd. v. ProGroup, Inc.*, 809 F.2d 971, 975 [2d Cir. 1987] [discussing "functionality" defense]).

If plaintiff has established secondary meaning as to the source and it is not defeated by the functionality defense, plaintiff must then establish the second prong of "likelihood of confusion", which is a showing that "a likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question" (*Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 75 [2d Cir.1988]). In assessing the likelihood of confusion, the Court *must* consider the 8 factors set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), which consist of:

(1) **Strength of the Senior User's Mark:**
Strength of a mark, has been defined as "its tendency to identify the goods sold under the mark as emanating from a particular ... source" (*McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131 [2d Cir.1979]);

(2) **Degree of Similarity Between the Two Marks:**
In determining similarity, "it is the combination of features as a whole rather than a difference in some of the details which must determine whether the competing product is likely to cause confusion" (*Harlequin Enters., Ltd. v. Gulf & Western Corp.*, 644 F.2d 946 [2d Cir.1981]);

(3) **Competitive Proximity of the Two Products:**
Where the two products are in direct competition with each other, the likelihood of confusion increases (*Lambda Elecs. v. Lambda Technology, Inc.*, 515 F.Supp. 915, 926 [S.D.N.Y.1981]);

(4) **Likelihood Plaintiff Will "Bridge the Gap":**
Occurs when the products are not in direct competition with each other. Question becomes: is plaintiff likely to enter this market? Here, there is direct competition, therefore this factor need not be considered.

(5) **Evidence of Actual Confusion:**
"Evidence of actual confusion is a strong indication that there is a likelihood of confusion" (*Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F.Supp. 1189, 1198 [E.D.N.Y.1983] [Glasser, J.]);

(6) **Junior User's Good Faith:**
The junior user's state of mind—*i.e.*, whether he was aware of plaintiff's mark when adopting his own—is relevant in determining likelihood of confusion as well as in balancing the equities (*Toys "R" Us, supra*, 559 F.Supp. at p. 1199);

**(7) Quality of Junior User's Product:**
"If the quality of the junior user's product is of a low quality, the senior user's interest in avoiding any confusion is heightened" (*Toys "R" Us, supra* ); and,

**(8) Sophistication of the Purchasers:**
Focus is whether the consumers spend much time evaluating the product before making a purchase or whether it is considered a "grab off the shelf" product (*Goya Foods, supra,* 732 F.Supp. at 457.)

Although these 8 factors were originally applied to *noncompeting* goods, the *Polaroid* test has since been applied to competing goods, like here, as well (*see Vitarroz Corp. v. Borden, Inc.,* 644 F.2d 960, 967 [2d Cir.1981] ). In addition to the above 8 factors, the *Toys "R" Us* case enunciated a ninth factor to be considered: the junior user's good will (*see Toys "R" Us, supra,* 559 F.Supp. at p. 1199).

■ In the context of obtaining a preliminary injunction, irreparable harm as well as likelihood of success on the merits are proven simultaneously upon a showing of likelihood of confusion as to the source (*Standard & Poor's Corp. v. Commodity Exchange, Inc.,* 683 F.2d 704, 708 [2d Cir. 1982]; *see also Score, Inc. v. CAP Cities/ABC, Inc.,* 724 F.Supp. 194, 199 n. 10 [S.D.N.Y.1989] ).

■ The Court finds after the evidentiary hearing that the plaintiffs have failed to satisfy their burden to establish a secondary meaning that the purchasing public associates their advertisements with a particular source, namely the plaintiffs. Although there is some undocumented evidence that plaintiffs have expended considerable sums on advertising and marketing, there is simply no evidence that the consuming public has come to associate the format, style, print and other items of its advertisements with a particular source, *i.e.,* plaintiffs. Also, it appears that plaintiffs have not been an *exclusive* marketer of multi-edged wipers, as there is evidence that other non-parties have entered the market and have been advertising their sale. The features of the ads of the non-parties also contains some similarity with plaintiffs' as well as defendant's ads. Thus, even though the plaintiffs have satisfied some of the *Polaroid* factors to prove the second prong to establish trade dress infringement, namely "likelihood of confusion", they have not met their burden as to "secondary meaning" as to the source, and therefore plaintiffs' application for a preliminary injunction on this ground is denied.

### (2) False Advertising

■ As to the "false or misleading" portion of section 43(a) of the Lanham Act, not only are actual *false* statements in advertisements prohibited, but so are statements that tend to deceive or create false impressions (*see Playskool, Inc. v. Product Dev. Group, Inc.,* 699 F.Supp. 1056, 1059 [E.D.N.Y.1988] [Nickerson, J.] ). Prior to the 1989 amendment of section 43(a), the Second Circuit established 2 different bases for recovery in a Lanham Act "false advertising" case:

"(1) an advertisement may be false on its face; or (2) the advertisement may be literally true, but given the merchandising context, it nevertheless is likely to mislead and confuse consumers. In *Coca-Cola Co. v. Tropicana Products, Inc.,* 690 F.2d 312 (2d Cir.1982), we described these alternative bases for recovery as follows:

'When a merchandising statement or representation is literally or explicitly false, the court may grant relief without reference to the advertisement's impact on the buying public. * * * When the challenged advertisement is implicitly rather than explicitly false, its tendency to violate the Lanham Act by misleading, confusing or deceiving should be tested by public reaction.' "

*Johnson & Johnson v. GAC International, Inc.,* 862 F.2d 975, 977 (2d Cir.1988) (citations omitted).

The *Playskool* court cogently summarized the applicable law on false advertising under section 43(a) in the context of a preliminary injunction as follows:

"When an advertising or merchandising statement is literally or explicitly false in the context in which it is made, *Avis Rent A Car System, Inc. v. Hertz Corp.*, 782 F.2d 381, 386 (2d Cir.1986), the court may grant relief without reference to the advertisement's impact on the buying public. *Coca–Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 317 (2d Cir.1982).

However, a plaintiff claiming that an advertisement, though literally true, tends to confuse or deceive consumers must, in order to establish a violation of the Lanham Act, present evidence showing what message the consumer will take from the advertisement. *McNeilab, Inc. v. American Home Products Corp.*, 501 F.Supp. 517, 525 (S.D.N.Y.1980). As that case noted: 'Though the Court's *own* reaction to the advertisement is not determinative, as finder of fact it is obliged to judge for itself whether the evidence or record establishes that *others* are likely to be misled or confused.' *Id.* at 525 (emphasis in original); *see also American Home Products Corp. v. Johnson & Johnson*, 654 F.Supp. 568, 590 (S.D.N.Y. 1987).

Where the plaintiff shows false or misleading advertising in violation of the Lanham Act, **the court will presume irreparable harm,** *McNeilab, Inc. v. American Home Products Corp.*, 848 F.2d 34, 38 (2d Cir.1988); where the false or misleading advertising claims could result in physical harm to the consuming public, that presumption is particularly appropriate. *McNeilab, Inc. v. American Home Products Corp.*, 675 F.Supp. 819, 826 (S.D.N.Y.1987), *aff'd,* 848 F.2d 34 (2d Cir.1988)."

699 F.Supp. at p. 1059 (emphasis supplied).

As a result of the 1989 amendment, the statute expressly and recently provides that misleading as well as literally false advertisements are actionable.

The Court finds that the WHITNEY advertisements of April 2, 1990, published in the *Chicago Sun Times,* and the future April 29 and May 6 advertisements are false, misleading and deceptive advertising, and, in this Court's view, are the precise types of deceptive advertising Congress intended to prohibit under the Lanham Act for the following reasons:

(1) Photographs of the complete wipers including their superstructure are shown in the ads, even though in the April 2, April 29 and May 6 ads, only the rubber portion and *not* the superstructure are offered for sale. This is so even though in small print, the ad states that wiper grips are not included. The public, with reasonable certainty will be deceived by such ads, since the public is unlikely to know what a "grip" is and there has been unrefuted evidence that there is "standard parlance" in the industry that the term "grips" refers to the metal on the rubber portion attaching it to the spline. The entire metal portion, as appears in the photograph, is called the "frame" or "superstructure" and not the "grips". The Court notes that the March 4 ad differs from the others in that it does offer for sale the entire wiper, including the superstructure.

(2) The statement that the wipers "fit virtually every U.S. and imported car" is false when in fact they do not. This is not merely misleading and deceptive, it is literally false. Initially, the Court notes that ROSNER conceded he does not know whether in fact they will fit virtually every car. ROSNER did testify, however, that to him, the phrase "virtually all" means 90% to 95% or "almost all cars" (Tr. at p. 70). However, as brought out through the testimony of Charles Fichtner ("FICHTNER"), Manager of Marketing and Chairman of the Boards of both plaintiff corporations, on many of the cars sold in the U.S. (including foreign and domestic models), the entire superstructure, not only the blade, must be changed. Additionally, as to the April 2, April 29 and May 6 ads, defendant's wipers come in only in 1 size: a standard width and 20″ long, which can be cut down to 14″. Thus, defendant's wipers will not fit many foreign cars, since the width on those cars is approximately 2mm smaller than defendant's wipers. In addition, defendant's wipers will not fit cars utilizing wipers with lengths of less than

14″ or greater than 20″. In short, the evidence showed that defendant's wipers *may* fit approximately 60% of the cars sold in the U.S., including both foreign and domestic, rather than "virtually all", and that is giving the defendant every reasonable view of the evidence. This significant and material representation, therefore, is literally false.

(3) Some of WHITNEY's ads also request the make, model and year of the cars, when such facts are irrelevant. This is deceptive and misleading since the ad does not say that WHITNEY sells only one size that has to be "cut down" with a pair of scissors by the consumer.

(4) In defendant's April 2, April 29 and May 6 ads it specifically states that the wipers "simply snap into place", when in fact ROSNER himself testified that it actually takes 3 or 4 steps *and* the use of a tool (screwdriver or pliers). Additionally, when given the opportunity on the witness stand, ROSNER repeatedly declined to attempt to demonstrate how they "simply snap into place".

(5) Statements as to what the product is made of, such as "Made of extra-durable rubber, they will never tear, split or dry out, because they resist heat, cold, chemicals and distortion far better than ordinary wiper blades," are misleading and may even be false, when in fact ROSNER has never tested or even seen the wipers (Tr. at pp. 51–57).

Therefore, this Court finds that the defendant WHITNEY RESOURCES, LTD. has violated section 43(a) of the Lanham Act insofar as its April 2, April 29 and May 6 ads contain misleading, deceptive and literally false statements of fact. The Court also finds that the March 4 ad, however, does not contain the same deceptive and false statements and is therefore not violative of section 43(a).

The Court finds that, with regard to the "false" or "misleading" portion of section 43(a), the plaintiffs have established by a clear showing: (1) irreparable injury, both presumed and actual; and, (2) likelihood of success on the merits of their "false" or "misleading" cause of action under section 43(a) of the Lanham Act.

ii. New York Unfair Competition Claim.

The basis for the New York claims here derive from New York General Business Law §§ 349, 350 and 368–d. An action under section 350, however, apparently may only be brought by the Attorney General. Section 349 does, however, create a private cause of action by one injured by reason of any violation of that section, which includes deceptive acts or practices in the conduct of any business, trade or commerce. Section 368–d is New York's "anti-dilution" statute, which provides for injunctive relief for infringement of registered or unregistered "marks" or in cases of "unfair competition", where there is likelihood of injury to business reputation or of dilution of the "distinctive" quality of a mark or trade name.

Thus, apart from the provisions of the Lanham Act, the courts have held that under New York law, there is protection available for "trade dress" *without* proof of secondary meaning, if: (1) the trade dress is "distinctive"; and, (2) the public is likely to be confused by the similar trade dress (*see 20th Century Wear, Inc. v. Sanmark–Stardust Inc.*, 815 F.2d 8, 11 [2d Cir.1987]; *Playskool, Inc. v. Product Dev. Group, Inc.*, 699 F.Supp. 1056, 1062 [E.D. N.Y.1988]). Where there is a finding of intentional or deliberate copying, "confusing similarity" is presumed, however, and need not be proven (*20th Century, supra*, 815 F.2d at p. 11; *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 618 F.2d 950, 952–53 [2d Cir.1980]).

The Court finds that although defendant's ads are clearly "confusingly similar" since there was intentional or deliberate copying of the ads, the Court also determines that the plaintiffs failed to meet their burden of proof to establish, at this time, that there is a "distinctive" mark or dress entitling them to protection under New York law.

After rendering the oral decision from the bench on April 16, 1990, counsel for the defendant raised the issue of the applicabil-

ity of section 32(2)(C) of the Lanham Act, 15 U.S.C. § 1114(2)(C), as amended. In particular, counsel argues that section 32(2)(C) prevents the Court from enjoining the publication of the FSIs advertisements on April 29 and May 6, 1990.

In addition, at oral argument on April 18, 1990, the Court was presented with a letter from Gerald A. Novack, Esq., counsel for non-party Valassis Inserts, Inc., dated April 18, 1990, addressing the possibility of removing the defendant's advertisements from the FSIs at issue. Mr. Novack also made an offer of proof on that date as to the potential significant expenses involved in the removal or redaction of the ads. Mr. Novack further offered to prove that the FSIs were already published and distributed, and even with the expenditure of "millions of dollars" it may be impossible to delete the ads at issue from the multi-page FSI.

The statute provides, in relevant part, as follows:

"(2) Notwithstanding any other provision of this chapter, the remedies given to ... a person bringing an action under section 1125(a) of this title shall be limited as follows:

\* \* \* \* \* \*

(C) Injunctive relief shall not be available to the ... person bringing the action under section 1125(a) of this title with respect to an issue of a newspaper, magazine, or other similar periodical or an electronic communication containing infringing matter or violating matter where restraining the dissemination ... would delay the delivery of such issue ... after the regular time for such delivery ... and such delay would be due to the method by which publication and distribution ... is customarily conducted ... and not due to any method or device adopted to evade this section or to prevent or delay the issuance of an injunction...."

15 U.S.C. § 1114(2)(C).

Although it is not clear whether FSI advertisements come within the meaning of an "other similar periodical" as set forth in section 32(2)(C), or whether an injunction would delay the publication of any newspaper, magazine or other similar periodical, it is not necessary to the determination of this application for a preliminary injunction and the Court declines to rule on this issue.

## CONCLUSION

 Based upon the foregoing, the Court finds that under section 43(a) of the Lanham Act, plaintiffs have made a sufficient showing of false, misleading and deceptive advertising in connection with the sale and marketing of the defendant's wipers in the April 2, April 29 and May 6 ads. Apart from *presuming* irreparable harm from defendant's violations of the Lanham Act by false or misleading advertising (*see Playskool, supra,* 699 F.Supp. at p. 1059), the Court also finds that there is sufficient evidence of actual irreparable harm that would ensue if the defendant is permitted to fill the orders resulting from the April 29 and May 6 advertisements. In particular, the Court notes that through these false and deceptive advertisements, the consumers of defendant's products who may not be satisfied or who purchase defendant's goods to their detriment, in that they are unable to install the rubber because it does not fit or cannot be "simply snapped into place", are not likely to return to the multi- or triple-edged wiper blade market again. This eliminates an entire prospective and, significantly unknown class of potential consumers for the plaintiffs.

Accordingly, the Court grants plaintiffs' application for a preliminary injunction based solely on false and misleading advertising under section 43(a) of the Lanham Act, as follows:

(1) As a result of the difficulty, if not impossibility, of deleting the offending ads from the FSIs already published, the defendant WHITNEY RESOURCES, LTD. is not enjoined from publishing all of the April 29, 1990 and May 6, 1990 "free standing inserts" ("FSIs") advertisements, which include those designated as "Multi–Angled Wiper Blades" as well as those designated as "Triple–Edged Wiper Blades". However, the defendant WHITNEY RESOURCES, LTD. is enjoined from filling

any orders resulting from those advertisements, and, further is directed to refund all sums received from all persons or entities who place orders as a result of those ads, at the defendant's expense, and in addition, the defendant WHITNEY RESOURCES, LTD. is directed to include a written letter with every such refund stating that, "WHITNEY RESOURCES, LTD. has been directed to return this order and refund all money paid, by Order of the United States District Court of the Eastern District of New York in *Tripledge Products, Inc. v. Whitney Resources, Ltd.*, No. CV 90–1071 (ADS), dated April 18, 1990"; and,

(2) The defendant WHITNEY RESOURCES, LTD. is enjoined from filling any orders resulting from the April 2, 1990 advertisement in the *Chicago Sun Times*, and, further is directed to refund all sums received from persons or entities who have placed orders as a result of this ad, at the defendant's expense, and in addition, the defendant WHITNEY RESOURCES, LTD. is directed to include a written letter with every such refund stating that, "WHITNEY RESOURCES, LTD. has been directed to return this order and refund all money paid, by order of the United States District Court of the Eastern District of New York in *Tripledge Products, Inc. v. Whitney Resources, Ltd.*, No. CV 90–1071 (ADS), dated April 18, 1990"; and,

(3) The defendant WHITNEY RESOURCES, LTD. is *not* enjoined, however, from filling any orders thus far received or received from this day forward in response to the March 4, 1990 advertisement, since the Court finds that the March 4, 1990 ad differs in significant respects from the April 2, 1990 ad and the proposed April 29, 1990 and May 6, 1990 ads; and,

(4) In accordance with Federal Rule of Civil Procedure 65(c), plaintiffs are required to post a bond in the amount of $100,000 within three (3) days of the date hereof and file proof of such undertaking with the Clerk of the Court on or before Monday, April 23, 1990.